IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | |
| | * | Case No. 15-26033 WIL |
| GREGORY B. MYERS | * | |
| | * | Chapter 11 |
| Debtor | * | |
| | * | |
| ———————————— | * | |
| OFFIT KURMAN, P.A. | * | |
| 4800 Montgomery Lane, 9th Floor | * | |
| Bethesda, MD 20814 | | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Adversary Pro. No. |
| | * | |
| SERV TRUST | * | |
| Gregory B. Myers, Trustee | * | |
| 3158 Braverton Street, Suite 206 | * | |
| Edgewater, MD 21037 | * | |
| | * | |
| Serve: Gregory B. Myers | * | |
| 700 Gulf Shore Blvd. North | * | |
| Naples, FL 34102 | * | |
| | * | |
| Defendant | * | |
| ———————————— | * | |

OFFIT KURMAN'S COMPLAINT TO AVOID SERV TRUST
LIEN AS A FRAUDULENT CONVEYANCE AND TO DETERMINE THE
PRIORITY AND AMOUNT OF LIEN AND OBJECTION TO SERV TRUST CLAIM

Offit Kurman, P.A. ("OK"), a creditor in the above captioned Chapter 11 Bankruptcy Case

of Gregory B. Myers ("Debtor"), by and through undersigned counsel, hereby files this Complaint

to Avoid Serv Trust Lien as a Fraudulent Conveyance and to Determine the Priority and Amount

of Lien and Objection to Serv Trust Claim (the "Complaint") pursuant to 11 U.S.C. §§ 502, 506,

548 and Rules 3003, 3007 and 7001 of the Federal Rules of Bankruptcy Procedure, and for cause

states as follows:

1

**I.**
**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B) and (K).

3.      Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The Plaintiff, Offit Kurman, P.A. is a close corporation formed under the laws of the state of Maryland and is a creditor in the above-captioned bankruptcy case and has standing to bring this action pursuant to 11 U.S.C. § 1109(b)[1].

5.      The Defendant, Serv Trust, is a trust created in the State of Maryland by the Debtor's mother for the benefit of the Debtor's five children and is listed as an undisputed secured creditor in the Debtor's Bankruptcy Case.

6.      The Debtor serves as the Trustee of the Defendant, Serv Trust, and at all relevant times was an "insider" of the Defendant as defined by 11 U.S.C. Section 101(31)(A)(iv).

**II.**
**PARTIES**

7.      The Plaintiff, Offit Kurman, P.A. is a close corporation formed under the laws of the state of Maryland and is a creditor in the above-captioned bankruptcy case and has standing to bring this action pursuant to 11 U.S.C. § 1109(b)[2].

8.      The Defendant, Serv Trust, is a trust created in the State of Maryland by the Debtor's mother for the benefit of the Debtor's five children and is listed as an undisputed

---

[1] 11 U.S.C. 1109 (b) states, "A party in interest, including the debtor, the trustee, a creditor's committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

[2] 11 U.S.C. 1109 (b) states, "A party in interest, including the debtor, the trustee, a creditor's committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

secured creditor in the Debtor's Bankruptcy Case.

9.      The Debtor serves as the Trustee of the Defendant, Serv Trust, and at all relevant times was an "insider" of the Defendant as defined by 11 U.S.C. Section 101(31)(A)(iv).

### III.
### PROCEDURAL POSTURE OF THE CASE

10.     On November 18, 2015, Gregory B. Myers filed a voluntary petition for relief under Chapter 11 of the United States Code in Case No. 15-26033 WIL ("Bankruptcy Case"). [Dkt. No. 1].

11.     On September 28, 2016, the Debtor filed a Motion to Sell Real Property Known as Lot 6, Seaside 14, Santa Rosa Beach, Florida 32459 ("Lot 6") Pursuant to 11 U.S.C. § 363(b) and § 363(f) of the Bankruptcy Code for a purchase price of One Million Seven Hundred Twenty-Two Thousand Five Hundred and 00/100 Dollars ($1,722,500.00) ("Purchase Price"). ("Motion to Sell").  [Dkt. No. 124].

12.     The Motion to Sell identified the following liens securing the Property:

   a)      Real Estate Taxes Walton County, Florida: $16,000.00
   b)      Regions Bank: $420,762.00
   c)      Seaside III Neighborhood Association, Inc.: $43,700.75 **(Disputed)**
   d)      Offit Kurman: $215,000.00 **(Disputed)**[3]
   e)      Serv Trust: $1,000,000.00
   f)      Regions Bank $320,879.74 **(Disputed)**

13.     The Proposed Order for the Motion to Sell ("Proposed Order") provided for the payment of liens and claims against Lot 6 as follows:

> Creditors Directed to Release Encumbrances.  Upon Closing, all Liens and Claims against the Seaside Property shall, without the necessity of further action on the part of  the Purchaser, Sellers or any creditor, be deemed released and discharged and shall attach to the  proceeds of the sale paid by the Purchaser, in the order of their priority, with the same

---

[3] On October 18, 2016, Offit Kurman, P.A. filed an amended claim with a secured amount totaling $550,000.00 and an unsecured amount totaling $208,722.23.

validity,  force and effect which they now have as against the Seaside Property.  Upon Closing, the  creditors of the Debtor are authorized and directed to execute such documents and take all other  actions as may be necessary to document the release of their Liens and Claims against the  Seaside Property, if any, as such Liens and Claims may have been recorded or may otherwise exist.

Payment of Allowed Secured Claims.  On the Closing Date, concurrently with the transfer of title to the Purchaser, or its permitted assigns, and the divestiture of the liens and security interests of the holders of Allowed Secured Claims, the indebtedness comprising the Allowed Secured Claims, including all allowable fees, expenses and other charges permitted  under the loan documents or applicable law, shall be paid in accordance with lien priority from  the proceeds of the sale.  To the extent that any fees, expenses or charges claimed by the holder  of the Allowed Secured Claim have been objected to, the aggregate amount of remaining  proceeds of shall be withheld and deposited into a segregated debtor-in-possession account and  shall not be used for any purpose whatsoever pending further Order of the Court.

14.     The Proposed Order provided for payment of Real Estate Taxes totaling Sixteen Thousand and 00/100 Dollars ($16,000.00); payment to Regions Bank totaling Four Hundred Twenty Thousand Seven Hundred Sixty-Two and 00/100 Dollars ($420,762.00); and payment to Serv Trust totaling One Million and 00/100 Dollars ($1,000,000.00) for an aggregate total of One Million Four Hundred Thirty-Six Thousand Seven Hundred Sixty-Two and 00/100 Dollars ($1,436,762.00), leaving gross net proceeds totaling Two Hundred Eighty-Five Thousand Seven Hundred Thirty-Eight and 00/100 Dollars ($285,738.00) to satisfy Nine Hundred Fourteen Thousand Five Hundred Eighty and 49/100 Dollars ($914,580.49) in disputed claims[4], the broker's commission to Berkshire Hathaway Beach Properties totaling Eighty-Eight Thousand Six Hundred Twenty-Five and 00/100 Dollars ($88,625.00), recording fees and settlement costs.

15.     OK believed the Purchase Price was reasonable and consented to the sale of the Lot 6 Property for the amount stated, but filed a limited objection to the sale on the basis that (a)

---

[4] Seaside ($43,700.75) + Offit Kurman ($550,000.00) + Regions Bank ($320,879.74) = $914,580.49 in disputed claims.

the lien amount due OK was Five Hundred Fifty Thousand and 00/100 Dollars ($550,000.00), not Two Hundred Fifteen Thousand and 00/100 Dollars ($215,000.00); and (b) the balance of the Serv Trust debt was disputed and the lien status of Serv Trust was voidable as a fraudulent conveyance ("OK Limited Objection"). [Dkt. No. 158].

16.     The Office of the United States Trustee ("UST") also filed a Limited Objection to the Motion to Sell ("UST Limited Objection"), raising the following questions as to the extent and validity of the Serv Trust lien and demanding that the Debtor should not be allowed to make any distributions to Serv Trust until the Court determines the valid amount due under the Serv Trust lien.

> What the Debtor fails to state in the Motion to Sell is that Serv Trust is a trust that was created by the Debtor's mother for the benefit of the Debtor's children. The Debtor is a trustee of Serv Trust. Thus, any payment to Serv Trust renders a direct benefit to the Debtor and his children. Given the Debtor's familial and fiduciary relationship with Serv Trust, the Debtor is not capable of scrutinizing Serv Trust's purported lien. The ability to scrutinize Serv Trust's lien is of critical importance given that the amount of lien has grown by $900,000 post-petition. As previously stated, the Motion to Sell and Disclosure Statement state that Serv Trust's lien is $1 million. Schedule D, however, which was signed by the Debtor, under oath, states that the amount of the Serv Trust lien was $151,500 on the Petition Date. Serv Trust did not file a proof of claim. The Debtor has not amended Schedule D. Prior to the distribution of the sales proceeds, the Debtor needs to explain how his mother's trust for which he is a trustee increased from $151,500 to $1 million during the course of this bankruptcy.

[Dkt. No. 153].

17.     On October 5, 2016, the Debtor filed a Disclosure Statement. [Dkt. No. 147].

18.     On October 18, 2016, the UST filed a Motion to Convert Case to Chapter 7 or, in the Alternative, to Dismiss Case, which reasserted concerns as to the validity and extent of the Serv Trust lien ("Motion to Convert"). [Dkt. No. 167].

19.     On October 18, 2016, the Debtor initiated three adversary proceedings disputing the amount and validity and extent of the liens held by Seaside III, Neighborhood Association,

5

Inc. [Dkt. No. 168], Regions Bank [Dkt. No. 169] and OK [Dkt. No. 170].

20.    At the October 19, 2016 hearing on the Motion to Sell and the objections filed thereto, the Debtor agreed to escrow all of the net proceeds from the sale of Lot 6 pending a further court order resolving the disputed liens.

21.    At the hearing, the Debtor presented an Exhibit Book to the Court and the respective parties which included a Combined Settlement Statement which summarized the projected disbursement of the proceeds from the sale of Lot 6 ("Settlement Statement").

22.    The Settlement Statement provided for the escrow and transfer of proceeds totaling One Million Two Hundred Thirty-Nine Thousand Three and 42/100 Dollars ($1,239,003.42) to the McNamee, Hosea Attorneys Escrow Account ("Escrowed Net Proceeds") after payment of:

a)    real property taxes owed to Walton County, Florida ($13,748.42);
b)    applicable government recording and transfer charges ($12,457.50);
c)    brokerage commissions ($88,625.00); and
d)    the allowed first priority Secured Claim of Regions Bank ($419,267.00).

23.    The following disputed secured claims totaling ($1,914,580.49) were to be escrowed pending further order of the Court:

a)    Seaside III Neighborhood Association, Inc.: $43,700.75 (Disputed)
b)    Offit Kurman: $550,000.00 (Disputed)
c)    Serv Trust: $1,000,000.00 (Disputed)
d)    Regions Bank $320,879.74 (Disputed)

24.    On October 25, 2016, the Court entered a Consent Order granting the Motion to Sell Lot 6, pursuant to 11 U.S.C. § 363(b) and § 363(f) of the Bankruptcy Code, which required the title company handling the closing to transmit the Escrowed Net Proceeds directly to Debtor's counsel for deposit into its attorney escrow account pending further application to and Order of the Court.  [Dkt. No. 175].

25.     A hearing on the UST Motion to Convert has been scheduled for November 22, 2016 at 10:00 a.m.  [Dkt. No. 171].

26.     A hearing on the Disclosure Statement has been scheduled for February 15, 2017 at 10:00 a.m.  [Dkt. 176].

**IV.**
**MATERIAL FACTS NOT IN DISPUTE**

27.     On February 1, 2016, the Debtor appeared with counsel and testified under oath at the continued Meeting of Creditors ("Meeting of Creditors"), which was recorded by the Office of the UST.

28.     On October 20, 2016, Paula J. Eliopoulos, of Gore Brothers Reporting & Videoconferencing, transcribed the recording of the Meeting of Creditors and certified that the transcript was a true and accurate transcription of the recording ("Transcript").

29.     Counsel for the Debtor provided a copy of the Serv Trust document for the UST's review at the meeting of creditors under the condition that the document remain in the Debtor's possession and not be disclosed to third parties.

> MR. GREENAN:     I have the Trust document here from the other – there's dual trustees and the other trustee does not want this published at all.  So I'm prepared to sit here while you read it and review it and confirm that it's not – he's not a beneficiary of it and all that other good stuff that you want to do, but I have to take it back.

Transcript Page. 14, Lines 11-17.

30.     The Debtor testified that he was the Trustee of Serv Trust, which was created by his mother on July 23, 2010 for the benefit of the Debtor's five (5) children.

> MR. MYERS:     Well, just to clarify.  You said that I own.  I, SERV TRUST is a Trust that I was not the settler, the grantor, however you want to phrase that.  I'm simply a trustee and the beneficiaries are my children.  So I have no beneficial interest in that Trust.

> THE TRUSTEE:     Who created the Trust?

7

MR. MYERS:          My mother, I believe, in 2010.

MR. GREENAN:        July 23rd, 2010, it appears.

Transcript Page 14, Lines 19-21; Page 15, Lines 1-7.

31.     The Debtor testified that Serv Trust is a fifty percent (50%) owner of 6789

Goldsboro LLC ("LLC"), which has a vacant residential property as its sole asset ("Property").

THE TRUSTEE:        And what are the assets in the Trust:

MR. MYERS:          It owns an interest in an LLC.

THE TRUSTEE:        What's the LLC?

MR. MYERS:          It's a Maryland LLC that owns a piece of property.

THE TRUSTEE:        Okay.  What's the name of the LLC?

MR. MYERS:          The name is 6789 Goldsboro LLC.  Just an O.  No u-g-h. B-o-r-o.
That's it.
THE TRUSTEE:        And this is a piece of property?

MR. MYERS:          Correct.

THE TRUSTEE:        Commercial or residential?

MR. MYERS:          Residential.

THE TRUSTEE:        Who lives there?

MR. MYERS:          Nobody.  It's vacant.

Transcript Page 15, Lines 8-21; Page 16, Lines 1-3.

32.     The Debtor testified that Serv Trust formed the LLC in 2013 or 2014 at the time

the sole asset of the LLC was purchased.

THE TRUSTEE:        Who formed the LLC of 6789 Goldsboro, LLC?

MR. MYERS:          SERV Trust.

THE TRUSTEE:        And when was 6789 Goldsboro, LLC formed?

8

MR. MYERS:        I don't know the exact date, but I'm going to take a guess and say it was in 2014, 2013.  Somewhere in there, those two years.

THE TRUSTEE:        The Trust was created July, 2010.  Why was the LLC created three to four years after the Trust was created?

MR. MYERS:        Because that's when the property was identified.

Transcript Page 40, Lines 17-21; Page 41, Lines 1-8.

33.    The Debtor testified that Joan Myers, the Debtor's mother, initially funded Serv

Trust with the deposit of One Thousand and 00/100 Dollars ($1,000.00) from a Charles Schwab

account.

THE TRUSTEE:        So the only thing that's in here is a – at the time the only thing that's in here is a –Joan Myers placed into this Trust was $1,000 account at Charles Schwab.  Am I misreading that?

MR. MYERS:        A payment.  A payment from a Charles Schwab account.  Not an account.

Transcript Page 42, Lines 3-6.

34.    The Debtor testified that he could not disclose the name of the remaining fifty

percent (50%) owner of the LLC, because they did not want their name made public

("Undisclosed 50% Owner").

THE TRUSTEE:        Why is this, though, not – why is it something that you don't want to share?

MR. MYERS:        Because we think that the – we know that the owner of the other half interest doesn't want it to be public.  He doesn't want it to be public.  He just doesn't want it to be public.

Transcript Page 19, Lines 6-11.

35.    The Debtor testified that the Undisclosed 50% Owner paid One Hundred Percent

(100%) of the purchase price for the LLC Property.

THE TRUSTEE:        Who funded 6789 Goldsboro to purchase the property?

MR. MYERS:            That is the other financial partner we were discussing earlier.

THE TRUSTEE:          So the other financial partner put up 100 percent of the purchase price of 6789 Goldsboro?

MR. MYERS:            I'm going to say yes and then this just –

MR. GREENAN:          He just doesn't want to answer any more questions about it, so –

MR. MYERS:            And Lynn, it's not because I don't want you to know it's simply because he doesn't want his business in public.  And he put up 100 percent, yes.

Transcript Page 42, Lines 15-21; Page 43, Lines 1-11.

36.    The Debtor testified that the LLC purchased the Property for One Million Three

Hundred Fifty Thousand and 00/100 Dollars ($1,350,000.00) in 2013 or 2014.

MR. MYERS:            I believe it was approximately $1,350,000.  Somewhere in that range.

THE TRUSTEE:          And it was purchased in 2013 or 2014?

MR. MYERS:            Yes.  To the best of my recollection.

Transcript Page 45, Lines 5-10.

37.    Under repeated questioning by the UST, the Debtor testified that the Serv Trust

distributed Fifteen Thousand and 00/100 Dollars ($15,000.00) per month to pay the tuition of the

Debtor's five children, from capital contributions made by the Undisclosed 50% Owner.

THE TRUSTEE:          Okay. What distributions, if any, have been given to your children from the Serv Trust in the last year?

MR. MYERS:            I'd have to do an accounting, but that was the number that you're adding to my disability.

THE TRUSTEE:          Okay.  So if it's just a single piece of property that has been vacant, how is it generating income to be distributed to the beneficiaries?

MR. MYERS:            Because the other partner had put some cash into that LLC.

THE TRUSTEE:          And that's why – and why did the other partner put cash into the

LLC that owns a single piece of property that's vacant?  I don't understand this.

MR. GREENAN:        It's a business arrangement.  It's a deal.

THE TRUSTEE:        Yeah.  But it's going to his, quote, children that was going – before you said that, was going into a bank account that he owned.  It was like $15,000 a month.  It's a lot of money.  So you're telling me now that this $15,000 a month that was distributing income to his is no longer an asset of his.  I get to explore this.

MR. GREENAN:        It never was an asset of his.  We're going to show you the Trust.

THE TRUSTEE:        But this makes no sense to me, how you're framing this as it's like almost dilapidated building on a piece of property, okay, that has been vacant for years but somehow is generating – had the ability to generate $15,000 a month to be distributed into an account owned by the debtor.  And now you're telling me, but Lynn, you can't learn anything about this.

Transcript Page 19, Lines 19-21; Page 20, Lines 1-21; Pages 21, Lines 1-11.

38.    The Debtor repeatedly characterized the payments from Serv Trust as

distributions to pay the private school education and expenses of his five (5) children and never

once mentioned that the payments were loans.

THE TRUSTEE:        So you're telling me that the Trust is paying for your kids' private school education?  Is that what you're saying?  Is that what the money is used for?

MR. MYERS:        The Trust – the five children are beneficiaries of a Trust.  The Trust can pay for –

THE TRUSTEE:        But I'm asking what it pays for.

MR. MYERS:        Let me finish.

MR. GREENAN:        Let him finish his answer, okay.  And then you can ask another one.  Please.

THE TRUSTEE:        Just be specific.

MR. MYERS:        A Trust, this Trust, where my five children are the beneficiaries, the Trust can distribute money for anything to their benefit, including education.

THE TRUSTEE:        I understand.  You tell me what did the Trust pay for of your children's expenses in the last year?

11

MR. MYERS          Food, clothes, tuition. Anything that those children need, which is well more than what the Trust distributed to them.

Transcript Page 27, Line 16-21; Page 28, Lines 1-16.

39.     The Debtor testified that the money was deposited from the Serv Trust into the

Debtor's sole checking account, which was comingled with other funds of the Debtor, and then

was used to "pay the cost of the children."

THE TRUSTEE:      Did you keep a running log of everything that you used the Trust money for to pay for your children's expenses?

MR. MYERS:      No, I did not keep a separate log. But if I had to just add up the tuition, that alone exceeds what came out of the Trust. That number –

THE TRUSTEE:      But you co-mingled the Trust fund money with your own money, did you not?

MR. MYERS:      I don't know how to answer that.

THE TRUSTEE:      Well that is a yes or no question. That's how you answer that. Did you co-mingle the children's Trust fund money with your own money?

MR. MYERS:      I don't consider it co-mingling. The Trust provides for either parent to pay the cost of the children.

THE TRUSTEE:      Did you deposit the Trust fund money into an account that had your own money in it?

MR. MYERS:      It went into my checking account.

THE TRUSTEE:      And how many checking accounts do you have?

MR. MYERS:      I have one that I closed that is now Capital One.

Transcript Page 29, Lines 14-21; Page 30, Lines 1-19.

40.     The Debtor acknowledged that he was not permitted to accept any post-petition

loans from any other parties without first obtaining permission from the court.

THE TRUSTEE:      Now, on October 22nd, 2015 Joan Myers, and that is your mother; is that correct?

MR. MYERS:          Yes.

THE TRUSTEE:       So on 10/22nd/2015 Joan Myers wrote you a check for $5000.  Was that a loan or was that a gift to you?

MR. MYERS:          It was a loan.

THE TRUSTEE:       And you know that you are not to accept any other loans without getting the court permission post-petition from your mother, your brother or anybody else?

MR. MYERS:          I do.  And I haven't.

Transcript Page 35, Lines 16-21; Pages 36, Lines 1-6.

41.    The Debtor's response, "And I haven't" confirming that he had not received any other post-petition loans is in direct contradiction with his current assertion that Two Hundred Twelve Thousand Three Hundred and 00/100 Dollars ($212,300.00) in post-petition loan payments were received, increasing the collateralized indebtedness due under the Serv Trust Mortgage.  **See:** Motion to Convert, pg. 9, ¶ 12.

42.    On June 26, 2014, Barbara Ann Kelly ("Debtor's Spouse"), as the borrower, and the Debtor, as the co-owner with the Debtor's Spouse of Lot 6, Seaside 14, executed a Mortgage in favor of Serv Trust, recorded on June 27, 2014 in the Land Records of Walton County, Florida in Instrument No. 2014661286249 ("Serv Trust Mortgage").  **See:** Exhibit 1.

43.    The Serv Trust Mortgage was recorded within two years of the November 18, 2015 filing of the Debtor's Bankruptcy Case, which may constitute grounds for avoidance of the mortgage as a fraudulent conveyance.

44.    The introductory paragraph of the Serv Trust Mortgage states as follows:

THIS MORTGAGE is made as of the 26th day of June, 2014, between BARBARA ANN KELLY (as "Borrower"), and BARBARA ANN KELLY and husband, GREGORY BRIAN MYERS (who joins in the execution of this Mortgage as a co-owner of PARCEL THREE (Lot 6, Seaside 14) secured hereby, and who is not responsible for the amounts due under the Credit Agreement defined herein), whose address is 4505 WETHERILL

RD, BETHESDA, MD 20816 (collectively, "Grantor") and SERV TRUST, whose address is 3158 Braverton Street, Suite 206, Edgewater, MD 21037 ("Lender"). All capitalized terms appearing herein and not thereupon specifically defined shall have the meanings for such terms set forth in the Definitions section at the end of this instrument.

45.     The Serv Trust Mortgage lists $1,000,000.00 as the maximum amount of the

secured indebtedness:

> THE MAXIMUM AMOUNT OF PRINCIPAL TO BE SECURED HEREBY AT ANY ONE TIME IS ONE MILLION AND NO/100 DOLLARS ($1,000,000.00).

**See:** Exhibit 1, pg. 1.

46.     The Definition section of the Serv Trust Mortgage defines the Credit Agreement

secured by the Serv Trust Mortgage as follows ("Credit Agreement"):

> **Credit Agreement.** The term "Credit Agreement" means the credit agreement dated of even date herewith evidencing a loan from the Lender to Borrower, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the said Credit Agreement.

**See:** Exhibit 1, pg. 7.

47.     The Debtor produced a copy of the Credit Agreement in response to the UST's

request for documents ("Serv Trust Credit Agreement"). **See:** Exhibit 2.

48.     The Serv Trust Credit Agreement stated that the Debtor and the Debtor's Spouse

were liable for all prior and future advances by Serv Trust to Kelly and/or Myers.

> It is specifically understood and agreed that the Total Amount Due shall include all prior advances made by SERV TRUST to Kelly and/or Myers, and all future advances, if any, made by SERV TRUST to Kelly and/or Myers. … Kelly and Myers agree to pay the Total Amount Due upon the earliest to occur (alone or in combination) of any of the following: (a) the sale of Mortgage Parcel 1, Mortgage Parcel 2, or Mortgage Parcel 3 (as those terms are defined below), or (b) on June 26, 2024, one installment of all unpaid principal, together with unpaid interest and any other charges described in this Credit Agreement.

**See:** Exhibit 2, pg. 1.

49.     The Debtor acknowledges that the Credit Agreement was created by him,

modeled after the OK Credit Agreement, and the he and his wife were jointly liable for the

money loaned by Serv Trust.

| | |
|---|---|
| MR. MYERS: | No, this is a credit agreement that evidences loans made by Serv Trust to my wife and myself. |
| TRUSTEE: | Okay.  And did you used a form when drafting this agreement? |
| MR. MYERS: | I believe I used the form of the credit agreement which Offit Kurman used. |
| TRUSTEE: | So on the top part of the credit agreement it says, for value received the undersigned, Barbara Ann Kelly, Kelly, and Greg B. Myers, Myers, hereby promise to pay the order of Serv Trust at 3158 Braverton Street, Suite 206, Edgewater, Maryland.  And can I ask you, whose offices 3158 Braverton Street, Suite 206, Edgewater, Maryland, whose offices are those? |
| MR. MYERS: | Daniel Ring's CPA firm is at that address. |
| TRUSTEE: | So after looking at this credit agreement, is it your testimony that you and your wife are obligated to Serv Trust for any loans made to you? |
| MR. MYERS: | I don't know, let me read it. Can we make a copy, please? |
| TRUSTEE: | You gave it to us. |
| MR. MYERS: | No, he – |
| MR. ORENSTEIN: | For purposes of your question, I assume you're asking him what his belief his (sic)? |
| TRUSTEE: | I want to know what his belief is as to whether he is obligated on this note with his wife to Serv Trust. |
| MR. ORENSTEIN: | Okay. |
| MR. MYERS: | My belief is, after reading this, that we are jointly responsible. |

Transcript Page 124, Lines 13-21; Pages 125, Lines 1-21.

50.    The Serv Trust Mortgage lists the following three properties as security interest

for the Credit Agreement:

PARCEL ONE:
Lot 3 of TOWN CENTER 30-A East, according to the plat thereof as recorded in Plat Book 15, Page(s) 51 and 51A, of the Public Records of Walton County, Florida.
Parcel Identification Number: 15-3S-19-25519-000-0030
Owner: BARBARA ANN KELLY.
THE REAL PROPERTY DESCRIBED ABOVE DOES NOT CONSTITUTE THE HOMESTEAD OF THE GRANTOR.

(hereinafter described as "Lot 3")

AND
PARCEL TWO:
Lot 13, Seaside 15 Subdivision, according to the plat thereof as recorded in Plat Book 15, Page 38 of the Public Records of Walton County, Florida.
Parcel Identification Number: 15-3S-19-25213-000-0130
Owner: BARBARA ANN KELLY.
THE REAL PROPERTY DESCRIBED ABOVE DOES NOT CONSTITUTE THE HOMESTEAD OF THE GRANTOR.

(hereinafter described as "Lot 13")

AND
PARCEL THREE:
Lot 6, Seaside 14 Replat Subdivision, according to the plat thereof as recorded in Plat Book 15, Page 34 & 34A of the Public Records of Walton County, Florida.
Parcel Identification Number: 15-3S-19-25212-000-0060
Owner: BARBARA ANN KELLY and husband, GREGORY BRIAN MYERS.
THE REAL PROPERTY DESCRIBED ABOVE DOES NOT CONSTITUTE THE HOMESTEAD OF THE GRANTOR.

(hereinafter described as "Lot 6")

51.    The Serv Trust Mortgage is virtually identical to the OK Mortgage.  **See:** Exhibits 3 & 4.

52.    The Serv Trust Mortgage replaced OK with Serv Trust as the Lender.  **See:** Exhibits 3 & 4.

53.    The maximum principal amount of $500,000.00 of the OK Mortgage was replaced with $1,000,000.00 in the Serv Trust Mortgage.

54.    The Serv Trust Mortgage added Lot 13 as additional collateral.

55.     The Serv Trust Mortgage references the same "Credit Agreement" that was referenced in the OK Mortgage even though the OK Credit Agreement contained specific references to the litigation for the underlying fees securing the OK Mortgage, which would make it difficult to convert as a Credit Agreement for the Serv Trust Mortgage without substantial edits.

56.     On April 8, 2015, the Debtor and the Debtor's Spouse executed a Settlement Agreement which acknowledged the entry of a June 20, 2014 judgment for Five Hundred Eighty-Two Thousand Seven Hundred Thirty-One and 72/100 Dollars ($582,731.72) in favor of Regions Bank and against the Debtor, with the following recitals:

> Regions asserted a claim against Kelly and Myers in the Circuit Court for Montgomery County, Maryland, Civil Action No. 351949-V relating to Kelly's and Myers' $326,879.79 home equity line of credit balance under loan or account numbers [Redacted] and [Redacted] (the "HELOC"). Kelly and Myers removed that action to the United States District Court for the District of Maryland, where it was styled *Regions Bank v. Gregory B. Myers and Barbara A. Kelly,* Case No. 8:11cv3033-RWT (the "Maryland HELOC Action").

> Kelly and Myers also asserted claims against Regions in the litigation styled *Barbara Ann Kelly and Gregory Brian Myers v. Regions Bank,* Case No. 3:11cv252-MCR/EMT in the United States District Court for the District of Florida, Pensacola Division.

> The parties consented to the transfer of the Maryland HELOC Action to the Northern District of Florida, and that action was initially assigned Case No. 3:12cv342-MCR/CJK. Both the federal actions were then consolidated when Regions filed its claim relating to the HELOC as a counterclaim in Case No. 3:11cv252-MCR/EMT (the "Northern District Action").

> Regions prevailed on all issues in the Northern District Action. The court's September 30, 2013 order granted summary judgment in favor of Regions and determined that Regions was entitled to attorneys' fees and costs incurred in pursuing its counterclaim. On February 27, 2014 and June 20, 2014, the court entered Judgments in favor of Regions in the total amount of $582,731.72, of which $326, 879.74 was for the principal owed on the HELOC (collectively, the "HELOC Judgments").

57.     On June 27, 2014, less than a week after the entry of the June 20, 2014 HELOC Judgments, the Debtor and his Spouse executed and recorded the Serv Trust Mortgage, in

advance of post-judgment collection efforts by Regions Bank.

58.    The Debtor asserted that Serv Trust held a lien in the amount of One Million and 00/100 Dollars ($1,000,000.00) in the Motion to Sell.  [Dkt. No. 124].

59.    In response to the UST's request for documentation supporting the One Million and 00/100 Dollars ($1,000,000.00) indebtedness secured by Serv Trust, the Debtor provided the UST with a summary of the payments received from Serv Trust ("Serv Trust Payment Summary").

60.    The UST attached a copy of the Serv Trust Payment Summary as an exhibit to the UST's Motion to Convert.  **See:** Exhibit 3. [Dkt. No. 167, Ex. 2].

61.    The following table analyzes the Serv Trust Payment Summary and includes (a) a summary of all payments received from the Serv Trust by the Debtor and his Spouse, (b) a summary of the payments that were made prior to the creation of the Serv Trust Mortgage, (c) a summary of the payments that were made after the creation of the Serv Trust Mortgage and prior to the filing of the Bankruptcy Case and (d) a summary of the payments that were made after the filing of the Bankruptcy Case ("Serv Trust Payments Summary Table").  Under the Payee column, "BAK" is an abbreviation for Barbara Ann Kelly, the Debtor's Spouse, and "GBM" is an abbreviation for Gregory Brian Myers, the Debtor.

| Date | Payee | Method | Amount | Accum. Amount | Accum. Pre-Mtge. | Accum. Post-Mtge. Pre-BK | Accum. Post-BK |
|------|-------|--------|--------|---------------|------------------|--------------------------|----------------|
| 03/10/2011 | BAK | Chk #102 | 5,000 | 5,000 | 5,000 | | |
| 03/16/2011 | BAK | Chk #104 | 21,500 | 26,500 | 26,500 | | |
| 03/17/2011 | BAK | Chk #105 | 17,500 | 44,000 | 17,500 | | |
| 05/11/2011 | BAK | Chk #107 | 5,000 | 49,000 | 49,000 | | |
| 05/16/2011 | BAK | Chk #108 | 10,000 | 59,000 | 59,000 | | |
| 05/25/2011 | BAK | Chk #109 | 25,000 | 84,000 | 84,000 | | |
| 05/31/2011 | BAK | Chk #110 | 30,000 | 114,000 | 114,000 | | |
| 06/01/2011 | BAK | Chk #112 | 25,000 | 139,000 | 139,000 | | |
| 07/22/2013 | GBM | WIRE | 150,000 | 289,000 | 289,000 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 07/26/2013 | GBM | Chk #134 | 50,000 | 339,000 | 339,000 | | |
| 08/01/2013 | GBM | Chk #135 | 50,000 | 389,000 | 389,000 | | |
| 08/02/2013 | BAK | Chk #136 | 10,000 | 395,000 | 395,000 | | |
| 08/21/2013 | GBM | Chk #137 | 30,000 | 429,000 | 429,000 | | |
| 09/17/2013 | GBM | Chk #139 | 4,500 | 433,500 | 433,500 | | |
| 02/27/2014 | GBM | WIRE | 100,000 | 533,500 | 533,500 | | |
| 04/24/2014 | GBM | WIRE | 100,000 | 633,500 | 633,500 | | |
| **$1,000,000.00 Serv Trust Mortgage Recorded on 6/27/2014** | | | | | | | |
| 07/31/2014 | GBM | WIRE | 10,000 | 643,500 | | 10,000 | |
| 07/31/2014 | GBM | Chk #151 | 1,500 | 645,000 | | 11,500 | |
| 08/01/2014 | BAK | WIRE | 5,000 | 650,000 | | 16,500 | |
| 08/05/2014 | GBM | WIRE | 400 | 655,400 | | 16,900 | |
| 08/05/2014 | BAK | WIRE | 3,500 | 653,900 | | 20,400 | |
| 08/06/2014 | GBM | WIRE | 4,000 | 657,900 | | 24,400 | |
| 08/14/2014 | BAK | WIRE | 2,000 | 659,900 | | 26,400 | |
| 08/14/2014 | GBM | WIRE | 2,000 | 661,900 | | 28,400 | |
| 08/18/2014 | GBM | WIRE | 5,000 | 666,900 | | 33,400 | |
| 08/22/2014 | GBM | WIRE | 18,000 | 684,900 | | 51,400 | |
| 08/27/2014 | BAK | Chk #158 | 1,000 | 685,900 | | 52,400 | |
| 10/16/2014 | GBM | WIRE | 10,000 | 695,900 | | 62,400 | |
| 11/12/2014 | GBM | WIRE | 10,000 | 705,900 | | 72,400 | |
| 12/16/2014 | GBM | WIRE | 25,000 | 730,900 | | 97,400 | |
| 02/24/2015 | GBM | Chk #162 | 15,000 | 745,900 | | 112,400 | |
| 04/13/2015 | GBM | WIRE | 15,000 | 760,900 | | 127,400 | |
| 05/11/2015 | GBM | WIRE | 30,000 | 790,900 | | 157,400 | |
| 06/11/2015 | GBM | WIRE | 14,900 | 805,800 | | 172,300 | |
| 07/15/2015 | GBM | WIRE | 15,000 | 820,800 | | 187,300 | |
| 07/30/2015 | GBM | WIRE | 30,000 | 850,800 | | 217,300 | |
| 08/17/2015 | GBM | WIRE | 30,000 | 880,800 | | 247,300 | |
| 08/20/2015 | GBM | WIRE | 15,000 | 895,800 | | 262,300 | |
| 08/28/2015 | GBM | WIRE | 15,000 | 910,800 | | 277,300 | |
| 10/14/2015 | GBM | WIRE | 15,000 | 925,800 | | 292,300 | |
| 11/02/2015 | GBM | WIRE | 14,800 | 940,600 | | 307,100 | |
| **Chapter 11 Bankruptcy Petition Filed 11/18/2015** | | | | | | | |
| 12/04/2015 | BAK | WIRE | 15,000 | 955,600 | | | 15,000 |
| 01/05/2016 | BAK | WIRE | 15,000 | 970,600 | | | 30,000 |
| 01/27/2016 | BAK | WIRE | 15,000 | 985,600 | | | 45,000 |
| 02/22/2016 | BAK | WIRE | 14,800 | 1,000,400 | | | 59,800 |
| 03/15/2016 | BAK | WIRE | 30,000 | 1,304,400 | | | 89,800 |
| 05/04/2016 | BAK | Chk #164 | 5,000 | 1,035,400 | | | 94,800 |
| 05/04/2016 | BAK | Chk #165 | 10,000 | 1,045,400 | | | 104,800 |
| 05/20/2016 | BAK | WIRE | 15,000 | 1,060,400 | | | 119,800 |
| 06/16/2016 | BAK | WIRE | 20,000 | 1,080,400 | | | 139,800 |
| 07/14/2016 | BAK | WIRE | 9,800 | 1,090,200 | | | 149,600 |
| 08/10/2016 | BAK | WIRE | 8,800 | 1,099,000 | | | 158,400 |

| 09/13/2016 | BAK | Chk #168 | 5,000 | 1,104,000 | | | 163,400 |
|---|---|---|---|---|---|---|---|
| 09/16/2016 | BAK | WIRE | 30,000 | 1,134,000 | | | 193,400 |
| 09/26/2016 | BAK | WIRE | 18,900 | 1,152,900 | | | 212,300 |

62.    The Debtor has claimed Six Hundred Thirty-Three Thousand Five Hundred and 00/100 Dollars ($633,500.00) in payments that were made over the three year period prior to the creation of the alleged Credit Agreement and the Serv Trust Mortgage.

63.    The payments prior to the creation and June 27, 2014 recording of the Serv Trust Mortgage began on March 12, 2016 and continued over a three (3) year period through and including April 24, 2014.

64.    The Debtor claimed Three Hundred Seven Thousand One Hundred and 00/100 Dollars ($307,100.00) in payments that were received after the creation of the Serv Trust Mortgage and prior to the filing of the Debtor's Bankruptcy Case.

65.    The Debtor claimed Two Hundred Twelve Thousand Three Hundred and 00/100 Dollars ($212,300.00) in payments that were received after the Bankruptcy Case was filed.

66.    On December 16, 2016, the Debtor filed Schedule I under oath in his Bankruptcy Case and listed income of the Debtor totaling Fourteen Thousand Five Hundred and 00/100 Dollars ($14,500.00) per month income as a Disability Insurance Benefit and zero (-0-) income for the Debtor's Spouse.  [Dkt. No. 19].

67.    On February 29, 2016, the Debtor filed an Amended Schedule I under oath in his Bankruptcy Case and added monthly income for the Debtor's Spouse of Two Hundred Forty-Six and 00/100 Dollars ($246.00) from rental property and Fifteen Thousand and 00/100 Dollars ($15,000.00) from a "Trust."  The Debtor provided the following statement under Question 13 of Schedule I as further explanation of the Debtor's Spouses' income from the Trust:

The income to the Debtor's wife is from a Trust.  Income to Debtor's wife is in the sole discretion of the Trustees of the Trust.  The Income from the Trust is used principally for

20

education expenses of the Debtor's children.

[Dkt. No. 42].

68.     The Debtor and Serv Trust have not filed a Proof of Claim on behalf of Serv Trust as of the filing of this Motion.

69.     The Debtor's assertion in the Motion to Sell [Dkt. No. 124] that the Serv Trust Payments were loans securing the Serv Trust Mortgage is in clear contradiction with (1) the Debtor's testimony at the Meeting of Creditors which identified the payments as distributions from Serv Trust for the payment of the private school tuition and educational expenses of his five children; (2) the Serv Trust Payments Summary, which identifies Six Hundred Thirty-Three Thousand Five Hundred and 00/100 Dollars ($633,500.00) in payments that were made over the three year period prior to the creation of the Serv Trust Mortgage; (3) the Debtor's testimony that the Serv Trust payments were made solely to the Debtor's wife, which is contradicted by the Debtor's Serv Trust Payments Summary listing the Debtor as the recipient of the majority of the payments and the Debtor's testimony that the payments were deposited into and comingled with the funds in the Debtor's sole checking account; (4) the Debtor's attempt to increase Serv Trust's lien position by claiming post-petition transactions totaling Two Hundred Twelve Thousand Three Hundred and 00/100 Dollars ($212,300.00) despite his testimony that there were no post-petition loans; and (5) the Debtor's Amended Schedule I, filed under oath, which state that the Serv Trust Payments were income to the Debtor's wife, not loan payments.

70.     The Debtor's fiduciary obligation as Trustee of Serv Trust is at direct odds with his obligations as a Chapter 11 Debtor.

## COUNT I
## Fraudulent Conveyance under 11 U.S.C. § 548(a)(1)(A)

71.     The preceding paragraphs are incorporated herein by reference as if set forth

verbatim herein.

72. 11 U.S.C. § 548(a)(1)(A) states in pertinent part as follows:

(a)(1) The trustee may avoid any transfer … incurred by the Debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
   (A) Made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

11 .S.C. § 548(a)(1)(A)

73.     On June 27, 2014, within two (2) years of the November 18, 2015 filing date of the Bankruptcy Case, the Debtor recorded the Serv Trust Mortgage securing Lot 3, Lot 6 and Lot 16.

74.     The Debtor's conduct in creating, recording and asserting a lien position in the amount of One Million and 00/100 Dollars ($1,000,000.00) is supportive of actual fraudulent intent based upon the following badges of fraud.

75.     The Debtor retained an interest in the transferred property by being in receipt of the payments from the Serv Trust Mortgage as set forth in the Serv Trust Payment Summary.

76.     The transfer was between family members for an allegedly antecedent debt based upon the Debtor serving as Trustee of the Serv Trust and the disbursements made for payment of the private school tuition and education expenses of the Debtor's five children.

77.     The transfer was made while there was a threat of litigation by the Debtor's creditors based upon the judgment that was entered against the Debtor by Regions Bank.

78.     The was a lack of or gross inadequacy of consideration for the transfer since the payments characterized by the Debtor as loans were in fact distributions to pay the private school tuition and education expenses of the Debtor's five (5) children.

79.     The Debtor retained possession and control over the property transferred based

upon his position as Trustee of the Serv Trust.

80.    The Debtor's continued application of the payments from Serv Trust as loans instead of distributions resulted in the fraudulent incurrence of indebtedness after the transfer.

81.    Based upon the Debtor's conduct, as supported by the six (6) badges of fraud discussed above, the Plaintiff has carried its burden of establishing that the encumbering of his real property with the One Million and 00/100 Dollar ($1,000,000.00) Serv Trust Mortgage was made within two years of the filing of the Debtor's Bankruptcy Case with the intent to hinder, delay or defraud creditors and was in fact fraudulent under 11 U.S.C. § 548(a)(1)(A) of the Bankruptcy Code and should be avoided in its entirety.

## COUNT II
## Fraudulent Conveyance under 11 U.S.C. § 548(a)(1)(B)

82.    The preceding paragraphs are incorporated herein by reference as if set forth verbatim herein.

83.    11 U.S.C. § 548(a)(1)(B) states in pertinent part as follows:

(a)(1) The trustee may avoid any transfer … incurred by the Debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
    (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
        (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
        (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
        (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
        (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 .S.C. § 548(a)(1)(B)

84.    The Debtor received less than reasonably equivalent value for the transfer by

characterizing the payments as loans instead of distributions.

85.    The Debtor was insolvent, became insolvent or had property remaining with unreasonably small capital or incurred debts that would be beyond the Debtor's ability to pay after the transfer of the Serv Trust Mortgage.

86.    The Debtor's schedules show that the Debtor was embroiled in eleven different law suits and foreclosure actions when the Bankruptcy Case was filed.  His liabilities exceeded his assets and his income continued to decline up to and after the filing of the Bankruptcy Case. The Serv Trust Mortgage is therefore voidable as a fraudulent conveyance pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT III
## Objection to Scheduled Claim under 11 U.S.C. § 502, Fed.R.Bank.P. 3003 and 3007

87.    The Preceding paragraphs are incorporated herein by reference as if set forth verbatim herein.

88.    Fed.R.Bank.P. 3003 (b)(1) and (c)(2) states as follows:

(b)(1) Schedule of Liabilities.  The schedule of liabilities filed pursuant to §521(1) of the Code shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated.  It shall not be necessary for a creditor or equity security holder to file a proof of claim or interest except as provided in subdivision (c)(2) of this rule.

(c)(2) Who Must File.  Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; and creditor who fails to do so shall not be treated as a creditor with respect to such claim for he purposes of voting and distribution.

89.    Fed.R.Bank.P. 3007 (a) Objections to Claims states as follows:

(a) An objection the allowance of a claim shall be in writing and filed.  A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession, and the trustee at least 30 days prior to the hearing.

90.     On December 16, 2015, the Debtor filed Schedule D: Creditors Who Have Claims Secured by Property and Part 1: 2.6 scheduled Serv Trust as a secured claim in the amount of One Hundred Fifty-One Thousand Five Hundred and 00/100 Dollars ($151,500.00).  [Dkt. No. 19].

91.     On November 7, 2016, the Debtor's Opposition to U.S. Trustee's Motion to Convert Case to Chapter 7 or, in the Alternative, to Dismiss Case listed Serv Trust with a "Scheduled Amount" totaling One Hundred Fifty-One Thousand Five Hundred and 00/100 Dollars ($151,500.00) and an "Estimated Anticipated Amount of Claim" totaling One Million and 00/100 Dollars ($1,000,000.00).

92.     Pursuant to Fed.R.Bank.P. 3003(b)(1), the schedule of liabilities constitutes prima facie evidence as to the validity and amount of the claim, subject to objection pursuant to Fed.R.Bank.P. 3007.

93.     The Debtor and Serv Trust have not filed a Proof of Claim on behalf of Serv Trust as of the filing of this Complaint.

94.     The Debtor's assertion in the Motion to Sell [Dkt. No. 124] that the Serv Trust Payments were loans securing the Serv Trust Mortgage is in clear contradiction with (1) the Debtor's testimony at the Meeting of Creditors which identified the payments as distributions from Serv Trust for the payment of the private school tuition and educational expenses of his five children; (2) the Serv Trust Payments Summary, which identifies Six Hundred Thirty-Three Thousand Five Hundred and 00/100 Dollars ($633,500.00) in payments that were made over the three year period prior to the creation of the alleged Credit Agreement and the Serv Trust Mortgage; (3) the Debtor's testimony that the Serv Trust payments were made solely to the Debtor's his wife to pay the private school tuition of his children, which is contradicted by the

25

Debtor's Serv Trust Payments Summary, which lists the Debtor as the recipient of the majority of the payments prior to the filing of the Bankruptcy Case; (4) the Debtor's attempt to increase Serv Trust's lien position by claiming post-petition transactions totaling Two Hundred Twelve Thousand Three Hundred and 00/100 Dollars ($212,300.00) in violation of the automatic stay; the and (5) the Debtor's Amended Schedule I, filed under oath, which state that the Serv Trust Payments were income to the Debtor's wife, not loan payments.

95.     The claim or Serv Trust should be disallowed in its entirety as both a secured and as an unsecured claim.

WHEREFORE, Offit Kurman respectfully requests that the Court enter an Order:

A.      Entering Judgment against the Defendant as to Count I of the Complaint, avoiding the Serv Trust Mortgage pursuant to 11 U.S.C. § 548(a)(1)(A); and

B.      Entering Judgment against the Defendant as to Count II of the Complaint, avoiding the Serv Trust Mortgage pursuant to 11 U.S.C. § 548(a)(1)(B); and

C.      Entering Judgment against the Defendant as to Count III of the Complaint, disallowing any scheduled or filed secured or unsecured claim by Serv Trust mortgage in its entirety; and

D.      For such other and further relief as is equitable.

Dated: November 18, 2016                          Respectfully submitted,


                                                   */s/ Gregory P. Johnson*
                                                   Gregory P. Johnson, Esquire (#09747)
                                                   Offit Kurman, P.A.
                                                   4800 Montgomery Lane, 9th Floor
                                                   Bethesda, MD 20814
                                                   O (240) 507-1700
                                                   F (240) 507-1735
                                                   gjohnson@offitkurman.com
                                                   *Counsel for Offit Kurman, P.A.*

4816-8452-2299, v. 1

26